May it please the Court, Kurt Hermanson on behalf of Mr. Williams. In this case, Mr. Williams should have received a full warning about representing himself, but instead did not receive a warning.  In this case, Mr. Williams should have received a full warning about representing   himself, but instead did not receive a warning about representing himself, but instead did not receive a warning about representing himself. In this case, Mr. So one question where I would say, you know, isn't there Reports from the court that the important thing here is, I mean, unless the court's going to change what Arnold says and create some exception, then this case has to be reversed because this was inadequate. And if I could just, I mean the whole, and I think the government, my friend kind of misstates the record, saying that, oh, well, Judge Benitez referred to the other hearing, and Mr. Williams said, yeah, I remember all that, that's not what happened. I mean, this is the question. But doesn't Erskine create the exception that you seem to be concerned about by having us look to the totality of the circumstances? Right. Erskine is the exception that your first question was heading for, I think. And Erskine is the exception to Arnold's, but Arnold is the rule. And even under Erskine's exception, the district court must ensure that the defendant understands the nature of the charges against him. Okay. So the government's argument is he's not going to forget the nature of the charges. I'll concede that. The possible penalties, he probably didn't forget what the possible penalties are, even though this is a guy who talked himself out of a 15-year sentence and into a 20-year sentence of sentencing, another completely irrational thing to argue with Judge Benitez and turn his 15-year sentence into a 20-year sentence. But the third thing is the dangers and disadvantages of self-representation. So why is it that Arnold says that when you have an intervening circumstance, like you've asked for counsel and counsel's been appointed, and then you're vacillating later, and here he's definitely vacillating. He sent three letters to the court right before the May hearing, one saying, I want to represent myself, the next one saying, the next day, saying, no, I don't want to represent myself. And then the third one saying, yes, I do want to represent myself. So even right before the hearing, he was vacillating. So how does vacillating really translate? I mean, on one level I can, but I got to tell you, I vacillate on cases all the time. That doesn't make the decision that I ultimately reach not knowing and intelligent. Indeed, it may reflect an effort to apply intelligence. So the fact that he changes his mind, does that really speak to whether or not his waiver is knowing and intelligent, and we can have confidence in that? I think it does because the standard is, are his eyes wide open when he makes the decision. And here it's the irrevocable decision, because Judge Menendez says, okay, good enough, we're done, and this is not happening again. You are not asking for counsel again. If he had asked for counsel again, you'd have a pretty powerful argument, though. Yeah, but, I mean, he was told, you can't. And it's wise not to mess with Judge Menendez, because you end up getting five years more. So he he talked himself into five years more. But the rule you inferred is probably not a bad rule to keep in mind. Yeah. I mean, be respectful and don't fight with the judge who's about to sentence you. The dangers and disadvantages of self-representation. So why does Erskine and Arnold talk about that? I think it's really important that this Court hold on to the requirement that those warnings be given. Why? Because if we don't, then more people are going to be representing themselves, and it's a bad thing for the courts, it's a bad thing for the defendant, for the government, for everyone. We have these, you know, it makes a mockery of justice. The trial was a joke. If he had an attorney at sentencing, the sentencing would have gone the way it did. And so that, I think, goes to the knowing and intelligent part of the waiver. I have had represented defendants when they talk to me at their sentencing say the most incredible things, and having an attorney there doesn't always present that. And also, when you talk about what a terrible job he did, it's also clear that, you know, he kind of knew what he was doing, and I'm not sure what kind of job an attorney would have done for him. I'm not seeing what the margin is between this guy represented and that represented, other than the sentencing, if we allow that, a lawyer would have been saying, don't say that, don't say that, and maybe he would have stopped. I'd like to reserve my time. You may do so. Good morning, and may it please the Court. My name is Matthew Sutton, and I'm representing the United States in this case. I think turning to the nature of the FREDA colloquy at issue here in the May 2012 hearing, I think we need to step back and examine the circumstances that led up to that May 2012 hearing. This is a defendant who, at his initial appearance in front of the magistrate judge in August of 2011, received a detailed and thorough FREDA colloquy. Now, it's true, as counsel pointed out, that at the conclusion of that hearing, he did allow an attorney for federal defenders to represent him. But less than a month later, in September of 2011, he goes before the district court, again requesting to represent himself. Judge Benitez goes through a detailed and lengthy FREDA colloquy which addresses the nature of the charges, the possible penalties he faced, and at great length, the dangers and disadvantages that Mr. Williams would face if he decided to represent himself at trial. He acknowledged all those warnings. And again, in October of 2011, Mr. Williams is before the court again on a motion hearing date, and Judge Benitez begins the hearing by reminding him, I have told you all the reasons why this is a bad idea to represent yourself. He's pointing out some of the issues involving Mr. Williams' motions that had been filed or have been purported to be filed by him. So by this point, in May of 2012, the district court had seen and observed Mr. Williams on multiple occasions. And while it is true that he requested the appointment of his standby counsel, who had been representing him from about October 2011 to January 2012, in January to represent him, that attorney filed substantive motions challenging the suppression or asking to suppress the pre-investigative questionnaire that he submitted. In April of 2012, Judge Benitez denied that motion. So at that point, there are no substantive issues left in this case. This case is ready to be set for trial. And that leads to that May 2012 colloquy then. And I think, you know, you have to examine what the record says. And I would just point the court's attention to the appellant's record, 2 ER 76. And the court starts by saying, you know, I've exhausted every possible argument that I have to you as why you should not go pro se. You know, explicitly talking or implicitly referencing the September 2011 colloquy, that August 2011 colloquy from magistrate Judge Schomel. Williams' response was right. And then Judge Benitez goes on to say, but my recollection is that I did a fret on this. And Williams' response was again, yes. So at this point, the district court is now confronted with a defendant who has appeared before on multiple occasions, sometimes representing himself, sometimes being represented by counsel. This is an individual who's fully aware of the charges and the possible penalties he's faced. Nothing has changed from his initial appearance back in August of 2011. This is not a case where additional charges have been added or that the advisals during August and September of 2011 were incorrect in any way. I noticed, you know, there's some cases that discuss that if a possible penalty had been misadvised. That's not the case. And he had been told repeatedly. And his own conduct showed that he knew about the danger of self-representation because he saw the difference when he was represented by that first attorney from federal defenders. And then when Mr. Zugman represented him from January 2012 to May 2012 versus his own efforts. But Mr. Williams had an absolute Sixth Amendment right, you know, as a competent individual to forego counsel and to represent himself. Now, that was obviously a foolish act. Kennedy. I kind of feel for the government's position here because you're watching a runaway train and the government has no role in the exercise of a Faretto right. And on one hand, I don't know if you were the attorney, whoever is sitting there is thinking that by that time they probably had a pretty good idea that Mr. Williams was a loose cannon and representing himself made the result pretty certain. Still, it had been, what, eight months since the Faretto colloquies had taken place. I'm not sure why the district judge was as impatient as he was, given that, and it takes a few minutes, but he's done it before, he'll do it again, and it had been eight months. It wasn't the scenario of this is the 15th time we've done it. So how confident can we be that the defendant really understood the implications of what he was doing at the time in May when he did it again? So let me address that point. And I think if this court finds that that was error for the district court not to go through the Faretto colloquy for the third time, I think that if you look at the record as a whole, it does demonstrate his waiver as knowing and intelligent. And I think you look at a couple of factors. You start with the background of this defendant. Now, this defendant was a 39-year-old individual. He had served in the United States Air Force. He was a high school graduate. He had attended college. He, you know, left about five credits short, as reflected in the psychiatric report. So this was not an inexperienced or an ill-educated defendant. You know, and again, the next factor, you look at the status of the case. Well, where were we in May of 2012? You know, the inquiry is, you know, what was in the defendant's mind at that point? And at that point, you know, he had briefed and argued, you know, pretrial motions. His attorney had done so as well. All of those proved to be unsuccessful. He was actively engaged in his own defense. Now, ultimately, the defense that he chose to put on a trial, that the images that were seized from his home media were child modeling images and not child pornography, you know, ultimately was an unsuccessful defense. That seems to be pretty clear that that's his theory throughout. And he, I think the difficulty that he had with the two attorneys that previously represented him is that they were unwilling or unable to allow him to argue that defense. Or at the very least, they told him, look, I have to tell you, this isn't going to fly. Exactly. Exactly. So and I think, you know, you look at the active participation that he had made in his own defense up to that point. And I think you also can consider some of the comments made in the psychiatric evaluation where this psychologist asked him specifically about, you know, his representing himself. And, you know, I believe that the report reflects that Mr. Williams was able to explain cogently and clearly why he decided to do so. And he, you know, admitted that he had made some mistakes at trial, but still defended that decision. He, you know, explained his rationale for representing himself. I think, you know, that's evidence in the record that, you know, goes to his state of mind. In May of 2012, this psychiatric evaluation was only in August, only several months later. So I think, you know, looking at those factors, the record as a whole demonstrates the waiver was knowing and intelligent, even if this court finds the district court should have continued on with the FREDA full colloquy at that point. Now, I just want to turn to the competency hearing issue in this case. And I think the major disagreement that the United States has with counsel's position is that Judge Benitez did not hold a competency hearing in this case. And it's for a very simple reason. The competency hearing was unnecessary. The psychiatric evaluation of Mr. Williams revealed that he did not have a personality disorder, did not suffer from depression or any of mood disorders, in fact, had an IQ of, you know, 112 in the 79th percentile. And while he had some grandiosity, you know, that may have affected his decision to represent himself, there were no mental health issues that this, you know, psychologist, you know, became aware of as a result of interviewing this defendant, discussing the case with him and also administering different psychological tests. So at that point, at the issuance of the report, the district court holds a psychiatric report hearing and both parties and Mr. Zugman as advisory counsel, you know, as well, submits on that report because at that point, there's no reasonable cause to question this defendant's competency either to stand trial or to represent himself. I mean, it's clear that, you know, while his decision was foolish, I mean, he did not suffer from any of the mental health illnesses that, you know, Edwards dealt with. You know, Edwards is dealing with, you know, borderline defendants who are so severely mentally ill that while they may have a very baseline competence to stand trial, they can't assist in their own defense. There's no evidence of any mental health issues in this case. And that report made that clear. So the district court's decision not to go ahead and hold a full-blown competency hearing was not erroneous. There was nothing that that hearing would have accomplished to change the district court's mind. Well, why isn't the language, granted it's form language, but when the district judge decided to start the ball rolling, he makes a finding. What about that finding? That's correct. And while the finding that the district court, you know, does make is using that dusky language, as counsel has pointed out, I think if you look at the text of the report, the nature of the report, it does discuss both issues. I mean, that's something that the psychologist did interview Mr. Williams about. And he made comments about he knew he represented himself at trial. He was asked specifically, you know, about his performance and what his reasons were for representing himself, what his reasons were for rejecting the plea offers made by the government in this case. So while, of course, I think that was the, you know, erroneous standard to be used, that, you know, the correct standard should have been used, was he competent to represent himself, ultimately, I think the substance of the report deals with that issue as well, even though it's not explicitly laid out as that standard. And if the Court does not have any more questions for me, I'd be prepared to submit on our briefs. Thank you. We'll take back the time, and thank you. Mr. Hermanson. Regarding the Arnold error in not re-advising Mr. Williams about the dangers and disadvantages of self-representation, the Mr. Williams went to community college, didn't graduate from community college. And as far as the July 2012 psychological report, the Court can't consider that. Erskine says that. So the government continues to argue that, well, let's look at the July 2012 report and see whether Mr. Williams was made a knowing and voluntary and intelligent waiver in May. And Erskine says you can't do that. You can't look at later evidence for someone's subjective mental state months earlier. Well, I mean, I hear your point in the same way that I raised with you the question of was there concern about competence in May. The May decision has to be made by the district court based on what is known in May. When we start looking broadly to the question of whether the decision was made knowing and intelligent, are we barred from looking at what actually happened? I mean, if it turned out at trial he was literally a babbling idiot, that would reflect in some fashion upon whether the decision he made in May was knowing and intelligent. Why couldn't the report that came out in July be used in the same fashion? Yeah, it can. And so my earlier argument was incorrect. I mean, I do like to look at everything in the totality and it colors everything, but it doesn't make sense when you're in May that that snapshot, we have to look at that snapshot in May at that hearing. What did the court know? What did the defendant know? How can we determine what his mental state was, his subjective mental state in May? Well, I'm really separating two different questions. One is the question of what the district court should have done in May. And the other is the question of in the full picture, was this case, it's the decision to waive counsel. But there are lots of circumstances where a waiver is examined as to whether the waiver was knowing and intelligent. And I don't know that there's a bar toward looking at any evidence where in the full picture you say, well, what happened subsequently gives us some feeling that maybe it wasn't perceived at the time, but that waiver couldn't be deemed knowing and intelligent because he turned out to be a nutcase or something. I mean, is there really a bar to looking at things that happened afterwards on the not on the what warning should be given, but on whether the waiver was actually knowing and intelligent? Almost kind of a harmless error analysis. The warning should have been given. That's an error. But what do we do now? Can't we look at everything? But it's not a harmless error. I understand. I'm making an analogy that doesn't apply, but it would allow us to look at everything if we want to know what the remedy is for the violation. And Erskine says you can't do that. I would refer to the Court to Erskine 355 F3rd, and the pinpoint is 1169 and 1170. And I think it makes sense that the Court should only look at what is known on the date of the hearing and what colors it from before then. Because mental state changes over time. Someone's subjective intent changes over time. And so to look back and color it with things that happened later doesn't doesn't work. And as far as the government's argument that there was no competency hearing, that's wrong. As we know, the way competency hearings almost always work is the judge says I find reasonable cause or to order a 4241 evaluation. The evaluation comes forward, and most people just submit, and they say, okay, well, the expert had this report, but that's a hearing. And it's rare, but the other opportunity is to cross-examine the expert and say, wait a minute, we're challenging this. And that's what could have happened but didn't happen in this case. So to say that the judge found reasonable cause, issued an order saying that we're going to have a competency hearing, but there really was no hearing, and therefore he didn't need an attorney, misstates the facts of the case. And if no questions, I would submit. Thank you. We thank you. We thank both counsel for your helpful arguments. The case just argued is submitted.
judges: Cogan, Schroeder, Clifton